UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Bernard Berrian,

      Plaintiff,

v.

Ronald R. Jones, Jane Doe, AKA Clarice
Lankford, Clinton Killian, Rachel Garner,
and Raymond Lankford,

      Defendants.

Civil No. 11-38 (JNE/JSM)
ORDER

---

Denise S. Rahne, Esq., and Christopher W. Madel, Esq., Robins Kaplan Miller & Ciresi LLP, appeared for Plaintiff Bernard Berrian.

Clinton Killian appeared pro se.

---

      Bernard Berrian left his personal electronic device, a Blackberry Curve, on an automated teller machine in Nevada. He returned to retrieve it several minutes later, but it was gone. Several weeks later, Berrian received word that information contained on the device would be sold to a third party unless he paid a substantial reward for the device's return. In January 2011, he brought this action against Ronald Jones and Jane Doe, the individuals who he believed were demanding the reward, for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g) (Supp. IV 2010). Berrian also asserted several claims under state law: conversion, trespass to chattels, replevin, intrusion upon seclusion, and publication of private facts. In October 2011, he filed a Second Amended Complaint in which he named three additional defendants: Clinton Killian, Rachel Garner, and Raymond Lankford. The case is before the Court on Killian's motion to dismiss. For the reasons set forth below, the Court grants Killian's motion to dismiss for lack of personal jurisdiction.

1

## I. BACKGROUND

The Court summarizes the Second Amended Complaint's allegations. In October 2010, Berrian left his Blackberry on an automated teller machine in Las Vegas, Nevada. He returned to retrieve it less than thirty minutes later, but it was gone. In December 2010, Berrian received inquiries regarding whether he had lost his Blackberry. He realized that an unknown party had his device and was attempting to contact him.

On December 22, 2010, Christopher Rehnke, Berrian's attorney and manager, started to investigate the inquiries Berrian had received about his Blackberry. Rehnke obtained a telephone number, which subsequent investigation revealed was assigned to a mobile phone owned by Jones, and attempted to contact Jones at the number via a text message. Rehnke received a telephone call from the number, answered, identified himself as Berrian's attorney and manager, and asked whether the caller had Berrian's Blackberry. The caller responded that he had the device, that his girlfriend had found it on an automated teller machine in Las Vegas, that she had removed the memory card, and that they had identified Berrian by reviewing material on the card. The caller identified himself as Roderick or Rod. Berrian believes that Jones was the caller.

From December 22, 2010, to January 4, 2011, Rehnke was a party to multiple e-mails and telephone calls with Jones and his girlfriend, whom Berrian identified in this action as Doe or Clarice Lankford. In the e-mails and calls, Jones indicated that the information contained on Berrian's device would be sold to the highest bidder if Jones and Doe did not receive a reward. On January 4, Jones and Doe demanded $30,000 for the device's return. Clarice Lankford maintains that she did not participate in the conversations but that Rachel Garner did.

In January 2011, Killian undertook to negotiate the return of Berrian's device. Killian communicated with Rehnke while Rehnke was working from an office in Minnesota. Killian possessed the device when he communicated with Rehnke.

The same month, Raymond Lankford undertook to advise Jones regarding the negotiations for the return of Berrian's device. Raymond Lankford referred Jones to Killian, consulted with Jones, and engaged in negotiations regarding the return of the device with Berrian's representatives.

Berrian's Blackberry contained banking information, financial statements, account receipts, and personal correspondence. It also contained passwords to accounts at financial institutions, the passcode to his residences, photographs, and videos.

Invoking jurisdiction conferred by 28 U.S.C. §§ 1331, 1367(a) (2006), Berrian commenced this action in January 2011. That month, the Court granted Berrian's motion for a temporary restraining order. The Court restrained Jones and Doe from disseminating or destroying information related to Berrian or his Blackberry, and ordered them to submit the device to the Clerk of Court. Later that month, the Clerk of Court received the device.

## II.   DISCUSSION

Killian moved to dismiss for lack of personal jurisdiction, lack of subject-matter jurisdiction, failure to state a claim, and failure to join an indispensable party; moved for a more definite statement; and moved to transfer the action to the United States District Court for the Northern District of California. The Court first considers whether personal jurisdiction over Killian exists. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 578 (1999); *Crawford v. F. Hoffman-La Roche Ltd.*, 267 F.3d 760, 764 (8th Cir. 2001).

3

To defeat a motion to dismiss for lack of personal jurisdiction, the plaintiff must establish a prima facie showing that personal jurisdiction exists. *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591 (8th Cir. 2011); *Romak USA, Inc. v. Rich*, 384 F.3d 979, 983 (8th Cir. 2004). Where, as here, a district court resolves an issue of personal jurisdiction without holding an evidentiary hearing, the court views the record in the light most favorable to the nonmoving party. *Pangaea, Inc. v. Flying Burrito LLC*, 647 F.3d 741, 745 (8th Cir. 2011); *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 646-47 (8th Cir. 2003). "The party seeking to establish the court's in personam jurisdiction carries the burden of proof, and the burden does not shift to the party challenging jurisdiction." *Epps*, 327 F.3d at 647.

"In a federal question case, where the defendant resides outside the forum state, federal courts apply the forum state's personal jurisdiction rules if the applicable federal statute does not provide for national service of process." *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004); *see CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011); *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010). Accordingly, the Court applies Minnesota's long-arm statute. *See CollegeSource*, 653 F.3d at 1073 (applying California's long-arm statute in case brought under the Computer Fraud and Abuse Act).

"Minnesota's long-arm statute confers jurisdiction to the fullest extent permitted by the Due Process Clause." *Coen v. Coen*, 509 F.3d 900, 905 (8th Cir. 2007); *see* Minn. Stat. § 543.19 (2010); *Juelich v. Yamazaki Mazak Optonics Corp.*, 682 N.W.2d 565, 570 (Minn. 2004). Due process allows a court to exercise personal jurisdiction over a nonresident defendant if the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v.*

4

*Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). The defendant's contacts with the state must be such that the defendant "should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Unilateral activity by one who claims a relationship with the defendant does not satisfy the requirement of contact with the forum state. *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Instead, the defendant must act so as to "purposefully avail[] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.*

The Eighth Circuit has established five factors to consider when determining whether the exercise of personal jurisdiction over a defendant comports with due process. *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010). They are: (1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts; (3) the relation of the cause of action to the contacts; (4) the forum state's interest in providing a forum for its residents; and (5) the convenience of the parties. *Id.* The last two factors are secondary. *Id.* A court "must look at all of the factors in the aggregate and examine the totality of the circumstances in making a personal-jurisdiction determination." *Id.*

The third factor distinguishes general jurisdiction from specific jurisdiction. *Wells Dairy, Inc. v. Food Movers Int'l, Inc.*, 607 F.3d 515, 518 (8th Cir.), *cert. denied*, 131 S. Ct. 472 (2010). "A court obtains general jurisdiction 'against a defendant who has "continuous and systematic" contacts with the forum state, even if the injuries at issue in the lawsuit did not arise out of the defendant's activities directed at the forum.'" *Johnson*, 614 F.3d at 794 (quoting *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1073 (8th Cir. 2004)). Specific jurisdiction refers to the

5

state's assertion of personal jurisdiction over a nonresident defendant in a suit that arises out of or relates to the defendant's contacts with the state.  *Id.*

*Killian's version*

In support of his motion to dismiss, Killian submitted an affidavit that recounted his involvement in the events that gave rise to this case.  The following paragraphs summarize it.

Killian is an attorney licensed to practice law in and a resident of California.  His office is in Oakland, California.  He is not authorized to practice law in Minnesota, he has never practiced law in Minnesota, he does not have an office in Minnesota, and he does not advertise in Minnesota.  He does not own property in Minnesota, and he does not have any employees, agents, clients, or business activities in Minnesota.

On January 12, 2011, Killian received a call from Raymond Lankford, who asked Killian to review settlement papers received by Raymond Lankford's daughter and her boyfriend.  Raymond Lankford stated that he would give Killian's telephone number to his daughter and her boyfriend and that they would call Killian.  Later, Killian received a call from Jones, who disclosed that he had found Berrian's telephone and that he was offered a reward for its return.  Jones also stated that he had spoken with Rehnke, Berrian's attorney in Fresno, California; that Rehnke had agreed to a $30,000 reward; that Rehnke had sent him legal papers that he did not understand; and that he wanted Killian to review the papers.  Killian agreed to review the papers, drafted a retention letter, and sent it to Jones at Jones's residence in Vallejo, California.

The same day, Killian received a call from Rehnke.  The number from which Rehnke called was assigned to an area code that serves Fresno, California.  Killian returned the call and spoke to Rehnke.  Rehnke stated that he was a California attorney who lived and worked in Fresno.  Rehnke confirmed the offer of a $30,000 reward and offered to send settlement

6

documents to Killian.  Killian stated that he could not perform any legal services until he received confirmation of his retention.

Later that day, Rehnke sent settlement documents to Killian via e-mail.  Rehnke's signature block included a telephone number that is assigned to an area code that serves Los Angeles, California.  The next day, Killian received another e-mail from Rehnke in which Rehnke requested a letter of representation from Killian, Raymond Lankford and Jones confirmed that they wanted Killian to represent Raymond Lankford's daughter and Jones, and Killian sent an e-mail to Rehnke in which Killian confirmed his representation of Clarice Lankford and Jones.  Killian briefly reviewed the settlement documents.

After Killian returned to his office on January 14,[1] a process server attempted to serve Jones through Killian with this action.  Killian stated that he was not authorized to accept service of process.  A short time later, Rehnke called Killian.  Killian stated that he was not authorized to accept service of process and that he would have declined the representation had he known of the pending lawsuit in Minnesota.

Later that day, Killian received a call from an attorney, Khaled Taqi-Eddin, who stated that his office was in Oakland, California, and that he would represent Clarice Lankford.  After receiving via e-mail a letter of representation from Taqi-Eddin, Killian continued their conversation.  Taqi-Eddin indicated that he had accepted service on behalf of Clarice Lankford and that an order requiring the return of Berrian's telephone had issued.  Killian responded that he did not have it, that he never had it, and that he would give it to Taqi-Eddin if he ever received it.

---

[1] Paragraph 8 of Killian's affidavit erroneously refers to December 14.

7

After returning to his office that evening, Killian discovered that a package had been delivered to him by an unidentified woman. He opened it and found a cellular telephone. Killian called Taqi-Eddin and left a message offering to deliver it to him.

On January 15, Taqi-Eddin asked Killian via e-mail to deliver the phone the following Tuesday. Killian agreed.

The next day, Killian received several messages from Jones in which Jones stated that Rehnke threatened him with criminal prosecution. Killian terminated his representation of Jones.

On January 18, Killian delivered the telephone by courier to Taqi-Eddin's office in Oakland, Taqi-Eddin's secretary took possession of it, and Taqi-Eddin confirmed he had received it. Rehnke called Killian, and Killian stated that the telephone was in Taqi-Eddin's possession. Killian also stated that he no longer represented Jones. Six days later, Killian received an e-mail from Berrian's counsel in this action asking whether Killian represented Jones. Killian responded that he did not. Service of the Second Amended Complaint on Killian in the fall of 2011 was the next contact he had with any of the individuals involved in this case.

*Berrian's version*

In the Second Amended Complaint, Berrian alleged that "Killian undertook to negotiate the return of [Berrian's] device and to that end . . . Killian engaged in discussions with Rehnke." The communications "took place while Rehnke was working from his office in Minnesota."

In response to Killian's motion, Berrian submitted affidavits and deposition testimony. The following paragraphs summarize their description of Killian's involvement in the events that gave rise to this case.

At her deposition, Clarice Lankford stated that Jones asked her in January 2011 to ask her father for the name of an attorney to whom Jones could speak about Berrian's telephone. Clarice

8

Lankford asked her father for the name of an attorney, he gave her Killian's name and number, and she passed on the information to Jones.

In his affidavit, Rehnke stated that he had multiple conversations via telephone and e-mail in late December 2010 and early January 2011 with Jones and Jones's girlfriend about Berrian's telephone. Jones and his girlfriend demanded $30,000 for its return. On January 12, 2011, Killian, an attorney in California, called Rehnke and left a message. Killian stated that he represented Jones. Rehnke returned Killian's call and indicated that he knew someone named Rod. Killian stated that he assumed Rod was the same person as Jones, that Clarice Lankford and Jones had the telephone, and that he had advised them to turn it over to him. Killian also indicated that he was aware of the situation, expressed interest in closing the deal, and stated he would facilitate the transaction. Killian gave an e-mail address to Rehnke and asked for the documents that Rehnke had sent to Jones. When he spoke to Killian, Rehnke stated that he was based out of Fresno, California; that he had an office there and one in Minneapolis, Minnesota; and that he was currently working out of Minneapolis. After the telephone call, Rehnke sent the documents to Killian via e-mail and requested a letter of representation from Killian. On January 13, Rehnke received an e-mail from Killian in which Killian confirmed his representation of Clarice Lankford and Jones.

*Analysis*

Berrian maintains that *Marquette National Bank of Minneapolis v. Norris*, 270 N.W.2d 290 (Minn. 1978), is "dispositive of personal jurisdiction over Killian." The Court does not agree. First, *Marquette* itself recognized that, "[i]n determining the constitutionality of exercising personal jurisdiction, the sufficiency of contacts must be evaluated in each case on its own facts." 270 N.W.2d at 297; *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 485-86

9

(1985) (stating that "the facts of each case must [always] be weighed in determining whether personal jurisdiction would comport with fair play and substantial justice" (alteration in original) (internal quotation marks omitted)); *Wells Dairy*, 607 F.3d at 520 n.3 (stating that "the determination that personal jurisdiction exists turns on the facts of each case"); *Clune v. Alimak AB*, 233 F.3d 538, 542 (8th Cir. 2000) ("The Supreme Court has rejected 'talismanic' formulas to personal jurisdiction. Rather, we must carefully consider the facts of each case to assess the nature of the contacts between the defendant and the forum state." (citation omitted)). Next, "*Marquette* was decided before *World-Wide Volkswagen* . . . . Since that decision, courts tend to require greater contacts before finding personal jurisdiction." *Mid-W. Med., Inc. v. Kremmling Med.-Surgical Assocs., P.C.*, 352 N.W.2d 59, 61 (Minn. Ct. App. 1984).[2] Finally, the facts of this case are not similar to those of *Marquette*:

> In [*Marquette*], Illinois residents negotiated a release of pledged securities owned by Minnesota residents in order to purchase those securities. The shares were pledged to a Minnesota bank, and the Illinois residents conducted all of the negotiations by mail and phone. The resultant transaction involved the execution of new promissory notes between the original debtors and the bank. The Illinois residents gave the debtors notes for the stock, with the stock as security, which were then assigned to the bank. This court held that the "crucial factor justifying the assumption of personal jurisdiction" was the fact that the nonresidents purposefully solicited the contacts and induced the financial transaction. Without this aggressive initiation by the nonresident, financing by the resident party can be considered the unilateral activity of the resident, which is insufficient to confer jurisdiction.

*Dent-Air, Inc. v. Beech Mountain Air Serv., Inc.*, 332 N.W.2d 904, 908 (Minn. 1983) (citation omitted); *see Bellboy Seafood Corp. v. Kent Trading Corp.*, 484 N.W.2d 796, 796 (Minn. 1992) ("It is our view that, even assuming the allegation of fraud contained in Bellboy's complaint, the *Marquette* analysis is both factually and qualitatively distinguishable from the event which gave

---

[2]   The Minnesota Court of Appeals recently made the same observation. *Joppru v. Rousher*, No. A10-1482, 2011 WL 1546149, at *2 n.1 (Minn. Ct. App. Apr. 26, 2011). The Court recognizes that *Joppru* is not precedential. *See Vlahos v. R&I Constr. of Bloomington, Inc.*, 676 N.W.2d 672, 676 n.3 (Minn. 2004).

rise to this action."); *Kremmling*, 352 N.W.2d at 61 (stating that *Marquette* "did not control this case" because "the transaction in *Marquette* was more complex than here and created higher quality contacts than found here").

In this case, Killian and Rehnke exchanged a few telephone calls and e-mails over the course of a few days. Killian was in California. When he spoke to Killian, Rehnke stated that he was based out of Fresno but was currently working out of Minneapolis. Although Rehnke did not disclose in his affidavit the telephone number he used to communicate with Killian, the Court inferred, and Berrian's counsel confirmed at the hearing, that Rehnke used a cellular telephone assigned to an area code that serves California. The communications between Rehnke and Killian yielded no agreement. The quantity of Killian's contacts with Minnesota is minimal, and their nature and quality do not support the exercise of personal jurisdiction over him. *See, e.g.*, *Johnson v. Woodcock*, 444 F.3d 953, 956 (8th Cir. 2006) ("The occasional correspondences between Johnson and Woodcock similarly do not support jurisdiction. 'Contact by phone or mail is insufficient to justify exercise of personal jurisdiction under the due process clause.'" (quoting *Porter v. Berall*, 293 F.3d 1073, 1076 (8th Cir. 2002))); *Aylward v. Fleet Bank*, 122 F.3d 616, 618 (8th Cir. 1997) ("Fleet Bank's contacts with Missouri consist of three telephone calls and one letter within seven months. Such contacts are not ordinarily sufficient by themselves to support the exercise of personal jurisdiction with respect to a defendant. Thus the nature, quality, and quantity of Fleet Bank's contacts . . . militate against the exercise of personal jurisdiction." (citation omitted)); *Digi-Tel Holdings, Inc. v. Proteq Telecommunications (PTE), Ltd.*, 89 F.3d 519, 523 (8th Cir. 1996) ("Although letters and faxes may be used to support the exercise of personal jurisdiction, they do not themselves establish jurisdiction.").

Berrian does not assert that general jurisdiction over Killian exists. Instead, Berrian contends that specific jurisdiction exists. He alleged in the Second Amended Complaint that "Killian undertook to negotiate the return of [Berrian's] device and to that end . . . Killian engaged in discussions with Rehnke." Killian's contacts with Minnesota relate to Berrian's claims against Killian. *Cf. Aylward*, 122 F.3d at 618.

Turning to the secondary factors, the Court assumes that Minnesota has an interest in providing a forum in which one of its residents, Berrian, may litigate claims against nonresidents. *See id.*; *Digi-Tel Holdings*, 89 F.3d at 525. Because Berrian did not adequately address the fifth factor, it weighs against him.[3] *See Aylward*, 122 F.3d at 618.

"So long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction." *Burger King*, 471 U.S. at 475 n.18. But "'some single or occasional acts' related to the forum may not be sufficient to establish jurisdiction if 'their nature and quality and the circumstances of their commission' create only an 'attenuated' affiliation with the forum." *Id.* In this case, Killian's conduct did not create a substantial connection with Minnesota. Berrian lost his telephone in Nevada. The individuals who found it and demanded a substantial reward for its return are from California. They consulted an attorney, Killian, in California. Killian contacted Berrian's attorney and manager, Rehnke, at a telephone number assigned to an area code that serves California. Rehnke told Killian that he was "based out of Fresno, California," had an office in Minneapolis, Minnesota, and "was currently working out of

---

[3] In the Second Amended Complaint, Berrian alleged that he is a citizen of Minnesota, that he resides in Minneapolis, and that his Blackberry contained "the passcode to his residences and the addresses of those same residences." Except for the one in Minneapolis, the record does not reveal where his residences are. Opposing Killian's argument to transfer the action to the Northern District of California, Berrian suggested he owns property outside of Minnesota: "[Berrian] maintains a residence in Minneapolis. The fact that [he] may own property and spend time in other states, whether it be Florida, California, or elsewhere, does not change this fundamental fact."

Minneapolis."[4] Although nothing in Rehnke's affidavit indicates that Rehnke actually told Killian he was "in" Minnesota—it is unclear what Rehnke meant by "working out of Minneapolis"—the Court, drawing all reasonable inferences in Berrian's favor, assumes that Rehnke was in Minnesota when he communicated with Killian. Even if Killian understood that Rehnke was in Minnesota, Killian's contacts with Minnesota are more akin to happenstance than purposeful availment of the privilege of conducting activities within Minnesota: Killian contacted an individual, Rehnke, who was "based out of Fresno" and was using a cellular telephone assigned to an area code that serves California when they communicated. They exchanged a few calls and e-mails over a few days, but they reached no agreement. Under the facts and circumstances of this case, Killian could not have reasonably anticipated being haled into court in Minnesota. Viewing the record in the light most favorable to Berrian, the Court concludes that he did not establish a prima facie case that personal jurisdiction exists over Killian. The Court therefore grants Killian's motion to dismiss.

### III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Killian's motion to dismiss [Docket No. 74] is GRANTED.
2. Berrian's claims against Killian are DISMISSED WITHOUT PREJUDICE.

Dated: February 17, 2012

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge

---

[4] Public records reveal that Rehnke is licensed to practice law in California but not in Minnesota.